UNITED STATES of America

v.

**Christopher UZZI, Defendant.**

**No. 82 Cr. 423 (LBS).**

United States District Court,
S.D. New York.

Aug. 2, 1982.

John S. Martin, Jr., U.S. Atty., S.D. New York, Robert S. Litt, Asst. U.S. Atty., New York City, for United States.

LaRossa, Axenfeld & Mitchell, New York City, for defendant; Karen Silverman, New York City, of counsel.

SAND, District Judge.

The following will constitute the court's opinion granting the Government's motion to disqualify the law firm of LaRossa, Axenfeld & Mitchell (previously LaRossa Brownstein and Mitchell) from representing the defendant, Christopher Uzzi, in this case. According to the Government, Michael Ross, an associate of that firm, participated in this case in its investigatory phase when he was employed as an Assistant United States Attorney. The Government contends that Canon 4 (which requires a lawyer to "preserve the confidences and secrets of a client"), Canon 5 (which prohibits conflicts of interest), and Canon 9 (which decries the "appearance of impropriety") of the American Bar Association Code of Professional Responsibility should disqualify the entire firm based on Mr. Ross' prior representation of the Government.

In support of its contention that the entire firm is disqualified, the Government cites Disciplinary Rule 5–105(D) which provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment."[1]

---

1. This is the text of the amended ABA rule as adopted in March 1974. It is worth noting that New York has not adopted this amended form. See American Bar Association Code, of Professional Responsibility State By State. New York retains the 1970 text, which reads: "If a lawyer is required to decline employment or to withdraw from employment under DR5–105, no partner or associate of his or his firm may accept or continue such employment." *Cheng v. GAF Corp.,* 631 F.2d 1052 (1980), vacated on other grounds, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981), discussed later in this opinion, cites the ABA's amended language.

In *United States v. Newman,* 534 F.Supp. 1113, 1120, (S.D.N.Y.1982), the Court found that this discrepancy in language does not detract from Cheng's clear holding that disqualification of the law firm must follow where the individual attorney is disqualified under Canon 4, since that holding is "consistent with the broad and remedial purposes of the Code."

We note, too, that the Code was not intended to provide the rules governing disqualification motions and that it simply "provide(s) guidance for the courts in determining whether a case would be tainted by the participation of an attorney or a firm." *Armstrong v. McAlpin,* 625 F.2d 433, 446 n. 26, (2d Cir. 1980) (en banc), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

The law firm attempts to justify its refusal to disqualify itself voluntarily by arguing that Mr. Ross' knowledge of this case acquired as an Assistant United States Attorney is too insubstantial to warrant his disqualification and that the firm's willingness to screen Mr. Ross from any participation in the case should be sufficient to dispel any questions about the appropriateness of the firm's representation of Mr. Uzzi.

## BACKGROUND

The facts in this case are, in all relevant aspects, undisputed. See Memorandum of Law in Opposition to the Government's Motion to Disqualify which we hereafter refer to as the Defendant's Memorandum, at page 2. The Government submits the affidavits of Assistant United States Attorney Robert S. Litt and a former Assistant United States Attorney, Scott W. Muller, setting forth the facts as summarized below.

Mr. Muller was assigned this case in October 1980. At that time, his role involved the supervision of an undercover FBI investigation of extortion of money from Toys 'R' Us, Inc. Mr. Muller states that he had "a close personal relationship with Michael Ross," who occupied the office next to his. Muller Affidavit at paragraph 4. Muller often discussed this case with Ross; he sought and received Ross' advice on "various legal issues ... (which) might be raised by the defense (,) ... possible ways the Government could develop additional evidence (,) ... certain tactical issues that (came up) in the handling and timing of the undercover investigation (,) ... (and the sufficiency of) an application for an electronic surveillance search warrant." Id. at paragraph 6. In addition, Ross "formally represented" the Government in this case in December, 1980, when he "obtained a sealed pen register order," and in June 1981, when he "issued a subpoena ... for telephone toll records." Id. at paragraph 8.

Mr. Litt states that in the course of his communications with the law firm with respect to the possible disqualification he was told by Paul B. Bergman, a member of the firm, that the firm intended to screen Mr. Ross from substantive contact with the case and that this precaution would be sufficient in view of the fact that Ross "never had 'administrative or supervisory responsibilities' for the investigation and had no recollection of 'any substantive aspect' of the case." Litt Affidavit at paragraph 5. Litt also states that Ross has told him "that he has very little recollection of his conversations with Mr. Muller, but ... that he has no reason to doubt that Mr. Muller's recollection of their discussions is accurate." Id. at paragraph 5 n. *.

The law firm has submitted the affidavits of Michael S. Ross, Paul B. Bergman and Christopher Uzzi. Mr. Ross states that when he was an Assistant United States Attorney he "was often consulted by other Assistants concerning cases which were assigned to them and which were either in the investigatory stage or were in their post-indictment phase. Particularly, near the end of my tenure in the office, I was, by reason of my seniority, frequently asked questions by other assistants about tactics, both at the investigatory and trial levels, legal questions and other matters which might properly be denominated confidential, at least at the time at which they were discussed. Those discussions were informal and part of the give and take in the office. Similarly, I would consult my colleagues concerning investigations that I was directly involved with and discuss, also in a sort of brainstorming method, matters of tactics and strategy, legal concepts and so forth. Names of particular targets or witnesses were normally not mentioned, not because anyone was purposely avoiding the mention of names but simply because the identity of any particular individual was usually irrelevant to the discussion. In a word, I am talking about 'skull' sessions with other Assistants of which there were many." Ross Affidavit at paragraph 3. He adds that it was also his practice "when requested by an Assistant who was out of the office, (to) sign off on various pro forma subpoenas and letters," id. at paragraph 4, and that he may have performed such acts in this case, id. at paragraph 7.

Ross states that when he first read the complaint in this case he "realized that I had had some minor contact with this case while I was an Assistant . . . " and remembered that his "close friend in the office, Scott Muller, had been involved in an investigation concerning Toys 'R' Us and that we had talked about it from time to time." Id. at paragraph 5. When he discovered that one of the defendants was to become a client of the firm, he informed the senior partner that "although I could barely remember even discussing the case with Scott Muller, much less what we had talked about, it might be best if I had nothing to do with the defense of Mr. Uzzi. . . ." Id. Ross does not remember any details of information that might have been conveyed to him, id. at paragraph 5, but does not doubt that Mr. Muller's recollection is correct, id. at paragraph 6.

Mr. Bergman notes that Ross had no supervisory responsibility and that he "has been completely isolated from involvement in all aspects of Mr. Uzzi's defense." Bergman Affidavit at paragraph 7. He also attempts to dispute the inference that such isolation will be difficult in an eleven-attorney firm by noting that the size of his firm is in fact unusually large for a firm specializing in criminal defense work. Id. at paragraph 9. He notes, too, that Ross has not divulged any confidences to anyone in the firm and that, since he remembers no such confidences, he could not do so.

The defendant Uzzi recounts that he decided to hire the LaRossa firm because he believed LaRossa to be "the best criminal defense attorney in New York and because his firm, by its size and because of its experience, is equipped to prepare for federal criminal trials." Uzzi Affidavit at paragraph 2. He did not know anything about Mr. Ross, and thus did not choose the firm in order to gain access to government secrets and confidences. Id.

The Court finds the documentation submitted to provide sufficient ground upon which to base its decision. All of the facts which the Court may properly consider on this motion under the applicable law are undisputed as the discussion below will show. The Court therefore rejects the suggestion contained in Defendant's memorandum at p. 2 n. 1, that the in camera testimony of Mr. Muller needs to be elicited.

## DISCUSSION

Michael Ross, personally, is not the chosen counsel of the defendant Uzzi; but the Court must consider the question whether Ross would be disqualified as an individual in order to reach the question whether the firm as a whole is disqualified.

 An attorney is disqualified from representing a party adverse to his former client in the same matter or in a substantially related matter. *NCK Organization, Ltd. v. Bregman,* 542 F.2d 128, 132 (2d Cir. 1976). Because it would defeat the goal of preserving the client's confidences and secrets, see Code of Professional Ethics, Canon 4, the client need not demonstrate that secrets and confidences were actually conveyed to the attorney he seeks to disqualify. Id. (citing *T.C. Theatres v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y. 1953). Rather, the court presumes that the attorney received confidences and secrets based on the prior representation. Id. This standard applies even in criminal cases. *United States v. Ostrer,* 597 F.2d 337 (2d Cir. 1979).

 There is no question that this case is substantially related to the investigation with which Mr. Ross had contact when he was an Assistant United States Attorney; this prosecution arose directly out of that investigation. Nor need this Court embroil itself in the question of which confidences or secrets remain fresh in Ross' mind, which are forever buried in oblivion, and which are presently forgotten but could, upon prompting, be summoned again into consciousness.[2]

**2.** We note in passing that it was the name "Toys 'R' Us" which originally jogged Ross' memory and prompted him to recall that he had discussed this case with Muller. Who is to say that some word or detail might not further refresh his memory as to other matters? Mem-

The question is presented whether Ross' role was such that he should be presumed to have received confidences. The Court finds it clear from Muller's Affidavit that Ross was in a position in relation to Muller, the attorney responsible for the supervision of the investigation, that exposed him to a flow of information about the case. The two attorneys, according to Muller, discussed many matters, enumerated above, such as what defense objections certain investigatory tactics would raise and whether a search warrant application was sufficient. The Court need not go beyond the face of the affidavit to see that Ross did not advise Muller of legal doctrine in a vacuum; the facts about the investigation necessarily came into play in these discussions. Cf. *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 756, (2d Cir. 1975) (attorney rebutted presumption that he had received confidences and secrets by showing that his work had been limited to "procedural matter(s) or research on a specific point of law.")

That Ross himself did not have supervisory authority is not dispositive here. Formalities, such as whether Ross was officially assigned to the case, should not control the Court's decision. Cf. *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 235, (2d Cir. 1977) ("Labels alone—partner, clerk, co-counsel," do not control in considering whether representation violates Canon 9). The Court of Appeals for the Second Circuit has stated that the proper inquiry under Canon 4 is into whether the attorney "was in a position to receive confidences" concerning the relevant matters. Id. See *Cheng v. GAF Corp.,* 631 F.2d 1052, 1054 (2d Cir. 1980), vacated on other grounds, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981) (disqualification of former senior attorney in Legal Services for the Elderly Poor who had not represented

the specific plaintiff in question but who "participate(d) in discussions with other members of the staff about the GAF case" and who subsequently moved to the firm which represented the defendant).[3]

When we confine ourselves to the appropriate inquiry, we see that there is nothing in the defendant's affidavits that contradicts the showing made by the Government. Ross concedes that the discussions took place and that Muller's account of the discussions is correct. Since we rejected the novel and unsupported proposition that the attorney's present alleged memory failure can avoid the mandate of Canon 4, we must reach the conclusion that Ross would be disqualified personally from representing the defendant Uzzi.

Turning now to the question of law firm disqualification, the Court agrees with the Government that a "Chinese Wall" will not suffice to "preserve the integrity of the adversary process" (*Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979)) under the circumstances of this case. We therefore find that Disciplinary Rule 5–105(D) applies with full force and dictates the disqualification of the LaRossa firm.

Under different circumstances, courts have eased the restraints of rule 5–105(D) and permitted law firms' screening procedures to avoid disqualification. See, e.g., *Greitzer & Locks v. Johns-Manville Corporation,* No. 81–1379 (4th Cir. March of 1982); *Sierra Vista Hospital v. United States,* 639 F.2d 749 (Ct.Cl.1981); *Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir. 1980) (en banc), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). (see footnote 3 supra re precedential value of this holding). See also, ABA Commission on Evaluation of Professional Standards, Model Rules of Professional Conduct, Proposed Final Draft (May 30,

ory is not so fixed and absolute that we can say with confidence: Ross has forgotten everything. It is therefore appropriate that a court should not base its decision whether or not to disqualify on this ground but rather should rely on the inference of retained knowledge that arises from his contact with the case.

**3.** While the binding constraints of this case are questionable in view of the Supreme Court's finding that the denial of the motion to disqualify could not be directly appealed, we find the Court's reasoning a persuasive application of a long line of precedent to a fact pattern strikingly similar to the one at hand.

1981), Rule 1.11(a) and (c); Opinion No. 889, Association of the Bar of the City of New York, 31 The Record 552 (1976). In the *Armstrong* case, the Second Circuit considered a case of disqualification under DR 9–101(B), which prohibits former government attorneys from "accept(ing) private employment in a matter in which he had substantial responsibility while he was a public employee." In accepting the "Chinese Wall" under the narrow factual setting of that case, the Court observed that the individual attorney's disqualification did not arise from the fear that privileged information might unfairly be used against a former client. Rule 9–101(B) follows Canon 9, and thus voices concern with the mere appearance of impropriety, a concern which has traditionally received less deference than the protection of secrets and confidences. See *Board of Education v. Nyquist,* 590 F.2d 1241, 1247 (2d Cir. 1979). A second reason why the *Armstrong* court accepted the "Chinese Wall" defense is that the individually disqualified attorney entered the law firm at a relatively late stage in the litigation, and law firm disqualification would have severely prejudiced the client.

The defendant relies heavily on the case of *United States v. McDonnell Douglas Corporation,* Crim. No. 79–516 (D.C.D.C. June 4, 1980), a criminal case in which the Court accepted the "Chinese Wall" defense for law firm disqualification. As the Government points out, however, in that case the Government had waived its objection to the participation of the challenged law firm and, moreover, the long attorney-client relationship, which predated the entry of the former Government attorney into the firm, raised a substantial issue of prejudice to the client. It is particularly significant that the court carefully considered the ethical problem presented by the firm's participation in the case even in the face of the former client's waiver. Here, where the former client actively objects to the "Chinese Wall" solution, we decline to expand the reasoning of the *McDonnell Douglas* case.

In *Cheng v. GAF Corp.,* 631 F.2d 1052, (2d Cir. 1980), vacated on other grounds, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981), the Second Circuit dealt with the question of law firm disqualification in a factual setting much closer to that in the present case. We have already discussed the facts in *Cheng.* Indeed, the *Cheng* court explicitly distinguished *Armstrong* as involving only Canon 9 and not Canon 4. The trial court in *Cheng* had accepted the "Chinese Wall" because it found the " 'risk of disclosure of confidential information is negligible.' " Id. at 1057. Finding the trial court to have abused its discretion, the Court of Appeals, noting particularly the smallness of the firm (which was over three times the size of the challenged firm herein), stated: "Despite the firm's protestations, it is unclear to us that disclosures, admittedly inadvertent, can be prevented throughout the course of this representation.... If after considering all of the precautions taken by the ... firm this Court still harbors doubt as to the sufficiency of these preventive measures, then we can hardly expect (the former client) or members of the public to consider the attempted quarantine to be impenetrable." Id. at 1058.

■ The doubts expressed in *Cheng* are also present here. The risk of disclosure in a small firm is in no way lessened by the fact that criminal law firms tend to be small. Nor are we willing to mitigate the harsh rule of law firm disqualification upon the attorney's invocation of a memory lapse. Our unwillingness does not stem from any mistrust of the integrity of the attorneys in this case. Rather, we are of the view that where the former client's secrets and confidences are threatened, the former client is entitled to the prophylactic protection of law firm disqualification and should not be forced to accept the assurances of the attorney that he has forgotten all secrets and confidences.

■ In reaching the conclusion that the law firm is disqualified, the Court recognizes that the right to counsel in a criminal case is of constitutional dimension. See U.S. Const., Amend. VI. Nevertheless, the right to counsel of choice is "not ... abso-

lute" and "must give way when required by fair and proper administration of justice." *United States v. Ostrer,* 597 F.2d 337, 341 (2d Cir. 1979) (motion to disqualify under Canon 4 granted; former Government attorney who had participated in an investigation of related case could not represent defendant in a criminal case where former client objected). Cf. *United States v. Cunningham,* 672 F.2d 1064, 1070–73 (1982) (denying motion to disqualify in the absence of a motion by former client, explicitly distinguishing Ostrer; motion based on attorney's prior representation of a prospective Government witness). We find that the threat to these proceedings, described above, and the unfairness to the former client, outweigh the qualified right of the defendant to choose his counsel. There is some merit in the argument that the constitutional dimension of the disqualification issue should make the Court more amenable to the suggestion that the "Chinese Wall" around Ross will be sufficient, but we think that on balance disqualification is appropriate in this case because of the potential sensitivity of the information communicated to Ross, the fact that the firm has not yet begun to represent the defendant in any substantial way, the smallness of the firm, and the strong public interest in maintaining the integrity of the criminal process.

Although, as we have already noted, no question is raised herein as to the integrity of defense counsel or the validity of Mr. Uzzi's reasons for choosing to be represented by the LaRossa firm, we are nevertheless concerned about the opportunities for abuse and manipulation which might be presented in other cases were this motion to be denied. For disqualification to turn on questions such as the Court's perception of the integrity of the individuals involved or the Defendant's motive in engaging counsel, obvious difficulties would be presented. A time-consuming collateral hearing might be required. The Government might run the risk, in its efforts to procure disqualification, of disclosing the very confidences it wishes to keep protected. Defendants might, in fact, be encouraged to retain counsel for improper motives or might be perceived by the public to be doing so. We believe the rule which we adopt strikes an appropriate balance, especially where, as here, neither the defendant nor challenged counsel have a considerable investment in the retention in this proceeding. This community is blessed with a multitude of well-qualified federal criminal defense attorneys from which Mr. Uzzi may select other counsel. We are confident that Mr. Ross' legal career as an associate of Mr. LaRossa's active firm will not suffer as a consequence of this ruling. The balance which we strike in granting this motion on these facts is, we believe, a just one conducive to the sound administration of criminal justice.

## CONCLUSION

The Court grants the government's motion to disqualify the firm of LaRossa Axenfeld & Mitchell from representing the defendant, Christopher Uzzi.

SO ORDERED.