[909 NYS2d 285]

In the Matter of the Arbitration between ESSEX EQUITY HOLD-INGS USA, LLC, Formerly Known as MAHER TERMINALS HOLDINGS CORP., et al., Claimants, and LEHMAN BROTHERS, INC., et al., Respondents.

JEFFREY L. CHERNICK et al., Petitioners. ESSEX EQUITY HOLD-INGS USA, LLC, Formerly Known as MAHER TERMINALS HOLDINGS CORP., et al., Respondents.

Supreme Court, New York County, June 10, 2010

## APPEARANCES OF COUNSEL

*Krebsbach & Snyder, P.C.*, New York City (*Barry S. Gold, Theodore A. Krebsbach* and *Theodore R. Snyder* of counsel), for petitioners. *Law Offices of Michael S. Ross*, New York City (*Michael S. Ross* of counsel), for Essex Equity Holdings USA, LLC and others, respondents.

## OPINION OF THE COURT

JAMES A. YATES, J.

In 1999, the New York Court of Appeals held, in *Kassis v Teacher's Ins. & Annuity Assn.* (93 NY2d 611 [1999]), that screening was ineffectual to save a law firm from disqualification when an attorney "side-switches," i.e., begins employment with the law firm after having worked for an adversary on the same matter, and when that attorney had acquired significant and material confidential information at the first firm. Notwithstanding *Kassis*, rule 1.11 of the New York Rules of Professional Conduct (22 NYCRR part 1200 [eff Apr. 1, 2009]) permits a private law firm to avoid disqualification by timely and effective screening when a government official leaves public service to work at the firm even where: (1) the official had acquired confidential government information which could be used to the material disadvantage of an adverse party; and (2) the official has participated personally and substantially in the same matter. The question arises whether *Kassis* precludes a law firm from continuing to represent a client in a matter, where the government is not a party, after hiring a prosecutor who has acquired significant and material confidential government information and has personally participated in connection with the same matter, if the firm complies with the screening and notice provisions of rule 1.11.[1]

---

1.   The rule seemingly permits an official to participate in a matter without personal disqualification, firm disqualification or the need to screen when the government agency gives consent as long as the official neither uses nor reveals confidential information (Rules of Professional Conduct [22 NYCRR

Petitioners move to disqualify the law firm of Kobre & Kim (K & K) from continuing to represent respondents in an arbitration proceeding that respondents commenced at the Financial Industry Regulatory Authority (FINRA) (case No. 08-00156). Petitioners argue that disqualification of K & K "is required because Sean Casey, former Deputy Chief of the Business and Securities Fraud Unit of the U.S. Attorney's Office in the Eastern District of New York, recently joined K & K as a partner." (Verified petition ¶ 2.) Further it is alleged, and not disputed,[2] that

> "[w]hile at the U.S. Attorney's Office, Casey led a criminal investigation . . . of Lehman's sale of auction rate securities ('ARS') to Respondents, among others. As part of the Investigation, subpoenas were issued under Casey's name requiring three of the Petitioners to appear and give testimony before a grand jury. The same ARS transactions that were a subject of the federal government's Investigation are the subject of the pending Arbitration." (Emergency affirmation of Barry S. Gold, Esq. ¶ 2.)

For the following reasons, petitioners' motion to disqualify is granted.

## I. Background

### A. Underlying Arbitration Action

Respondents allege that in March 2007, respondents "M. Brian Maher and Basil Maher negotiated the sale of their family business," which specialized in the operation of marine

1200.0] rule 1.9 [c]; rule 1.11 [a]). However, in the case before the court, the attorney, Sean Casey, has not sought consent. Casey met with Peter Norling, the Professional Responsibility Officer for the U.S. Attorney's Office in the Eastern District who advised Casey that he would be prohibited, at any subsequent legal job, from working on any matter in which he had worked or had supervisory authority while at the U.S. Attorney's Office. (Transcript at 128-130.)

2. In this proceeding, Casey, invoking Federal Rules of Criminal Procedure rule 6, has been appropriately careful not to disclose any information about the investigation. However, there appears to be no contest over the alleged and publicly reported fact that there was such an investigation and that he personally participated in it (emergency affirmation of Barry S. Gold, Esq. ¶ 2). That fact, in turn, is "sufficient to raise the presumption that [the attorney] gained confidential information" and "a party seeking disqualification of an attorney on the basis of the substantial relationship test is not required to present evidence that the attorney possesses actual confidences as a result of the prior representation" (*Decora Inc. v DW Wallcovering, Inc.*, 899 F Supp 132, 138 [SD NY 1995]).

terminals in existence for over 60 years (*id.*, exhibit A [second amended statement of claim] ¶ 27). "By approximately July 26, 2007, [respondents] had wired a total of US $600 million to Lehman" (*id.* ¶ 2). Respondents then claim that petitioners "invested it in ways that differed radically from" the provided sample investment portfolio and respondents' investment objectives given to petitioners (*id.* ¶ 2; exhibit A [second amended statement of claim] ¶ 46). As a result, respondents assert they lost "the ability to access or invest their approximately US $286 million" (*id.* ¶ 2; exhibit A [second amended statement of claim] ¶ 110).

On January 17, 2008, "K & K, acting as counsel to Respondents, filed the Statement of Claim that commenced the Arbitration on behalf of Respondents against Lehman and Petitioners" (verified petition ¶ 19). On September 19, 2008, "Lehman filed for bankruptcy, which, among other things, automatically stayed the Arbitration as against Lehman" (*id.* ¶ 20). Twenty-five days later, on October 14, 2008, K & K asked that the arbitration be placed on "hold" while it considered whether to pursue claims against the remaining parties. Respondents further allege that on October 1, 2009, Casey joined K & K and six days after that, on October 7, 2009,[3] K & K informed FINRA that it intended to proceed against petitioners (verified petition ¶ 21).

B. Procedural History

By order to show cause dated April 16, 2010, petitioners sought to stay the arbitration and to disqualify K & K from representing respondents in the arbitration. The court heard testimony on April 26 and 27, 2010 by Casey and Michael Kim, a senior partner at K & K. The court credits their testimony as truthfully given.

The issue of disqualification is before the court rather than the arbitration panel because "matters of attorney discipline are beyond the jurisdiction of arbitrators" (*Bidermann Indus. Licensing v Avmar N.V.*, 173 AD2d 401, 402 [1st Dept 1991]).

> "Issues of attorney disqualification similarly involve interpretation and application of the Code of Professional Responsibility and Disciplinary Rules, as well

---

**3.** Casey testified that he began working at K & K in "mid-October" (transcript at 28) and a letter in evidence from Robert Henoch, a partner who headed the Essex team, to the U.S. Attorney's Office says he joined the firm "on or about October 19, 2009" (letter, Robert Henoch to Peter A. Norling, Assistant U.S. Attorney, respondents' exhibit 4). It is unclear precisely when he "joined" the firm and when he "began working" there.

as the potential deprivation of counsel of the client's choosing, and cannot be left to the determination of arbitrators selected by the parties themselves for their expertise in the particular industries engaged in" (*id.* [citations omitted]).

As well, the court is mindful of the admonition that

"[m]otions to disqualify are generally not favored. They are often tactically motivated; they cause delay and add expense; they disrupt attorney-client relationships sometimes of long standing; in short, they tend to derail the efficient progress of litigation. Thus, parties moving for disqualification carry a 'heavy burden' and must satisfy 'a high standard of proof.' But if there are doubts . . . 'doubts should be resolved in favor of disqualification.' Thus, a balance must be struck between being 'solicitous of a client's right freely to choose his counsel,' and protecting the 'need to maintain the highest standards of the profession' and the 'integrity of the adversary process.' " (*Felix v Balkin*, 49 F Supp 2d 260, 267 [SD NY 1999] [citations omitted].)

Although reference is made to the Rules of Professional Conduct by the parties and throughout this opinion, the court recognizes that a "violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." (New York State Bar Association, New York Rules of Professional Conduct, Scope [12], available at http://www.nysba.org/Content/ NavigationMenu/ForAttorneys/ProfessionalStandards forAttorneys/RulesofProfessionalConduct.pdf.) "[The] rules contained in the Code of Professional Responsibility, which have been superseded by the Rules of Professional Conduct, provide guidance, but are not binding authority, for the courts in determining whether a party's attorney should be disqualified during litigation" (*Falk v Gallo*, 73 AD3d 685, 686 [2d Dept 2010] [concerning lawyer as witness under rule 3.7]; *cf. Armstrong v McAlpin*, 625 F2d 433, 446 n 26 [2d Cir 1980] [although ABA Committee that drafted Code has indicated rules were intended for use in disciplinary proceedings rather than in disqualification proceedings, court refers to Code for guidance], cited with approval in *S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp.*, 69 NY2d 437, 444-445 [1987]; *see also People v*

*Abar*, 99 NY2d 406 [2003]; *People v Smart*, 96 NY2d 793 [2001]; *People v Longtin*, 92 NY2d 640 [1998]; *GD Searle & Co., Inc. v Pennie & Edmonds LLP*, 7 Misc 3d 1010[A], 2004 NY Slip Op 51874[U] [Sup Ct, NY County 2004]; *Gidatex, S.r.L. v Campaniello Imports, Ltd.*, 82 F Supp 2d 119 [SD NY 1999]).

## II. Discussion

Casey does not dispute that he participated personally and substantially in connection with the matter which is the subject of the arbitration proceeding. As well, he does not contest the allegation that he acquired confidential government information.[4] The Government is not a party to the arbitration. Still, Casey recognizes that he is personally disqualified from participating in the proceeding because rule 1.11 is not limited to cases where the government agency is itself a party. Comment 3 to the rule cautions, in part, that the disqualification provisions apply

> "regardless of whether a lawyer is adverse to a former client and are thus designed not only to protect the former client, but also to prevent a lawyer from exploiting public office for the advantage of another client. For example, a lawyer who has pursued a claim on behalf of the government may not pursue the same claim on behalf of a private client after the lawyer has left government service" (New York State Bar Association, Rules of Professional Conduct rule 1.11, Comment 3, available at http://www.nysba.org/Content/NavigationMenu/For Attorneys/ProfessionalStandardsforAttorneys/RulesofProfessionalConduct.pdf).[5]

Nevertheless, K & K contends that it has complied with the screening and notice provisions outlined in rule 1.11 (b) and,

---

4. In evidence is a memorandum, dated December 9, 2009, by Benjamin Leyland, senior risk management analyst at K & K, and Zoe Ehrlich, chief administrative officer, in which they write, after interview of Casey, "As a result of his position, Sean either participated personally and substantially in, was officially responsible for, or gained confidential information regarding various matters at issue for our clients" (respondent's exhibit 1 at 1), which then references a number of matters, including, apparently, the present arbitration. This is repeated in similar memos dated December 15, 2009 and January 14, 2010.

5. "The Appellate Division has not enacted the Preamble, Scope and Comments, which are published solely by the New York State Bar Association to provide guidance for attorneys in complying with the Rules." (New York State Bar Association, Resources on Professional Standards for Attorneys in New York State, available at http://www.nysba.org/Content/NavigationMenu/

therefore, the firm may ethically continue to represent respondents as long as Casey remains effectively isolated from the matter.

Petitioners counter that "K & K is presumptively disqualified because Casey is disqualified," relying in part on the holding of *Kassis* (*supra*). They assert that

> "where an attorney is disqualified as a result of having acquired confidential information at a prior position, there is a 'presumption that the entirety of the attorney's current firm must be disqualified,' and to rebut the presumption the law firm must demonstrate that (1) 'any information acquired by the disqualified lawyer is unlikely to be significant or material in the litigation,' *and* (2) an 'effective screen has been implemented' . . . Only if the law firm satisfies the first requirement need the court proceed to the second step." (Petitioners' mem of law in support at 6 [Apr. 16, 2010].)

Thus, the issues before the court are: (1) does *Kassis* prohibit use of the screening procedure provided by rule 1.11 in this case; and if not, (2) did respondents meet the requirements of rule 1.11?

## A. *Kassis*

*Kassis* involved an attorney with "extensive participation" in a matter on which he worked at in his prior law firm, who then switched to another firm that represented the "adversary in the same matter" (*Kassis*, 93 NY2d at 618-619). In *Kassis*, the associate, at his prior firm, "conducted five depositions," "attended two court-ordered mediation sessions as sole counsel for the client, appeared as [the client's] attorney at a physical examination . . . , and conversed with [the client] on a regular basis" (*id.* at 614). The Court, referring to the applicable Code of Professional Responsibility (22 NYCRR part 1200 [repealed eff Apr. 1, 2009])[6] provisions then in effect, found that

> " 'side switching' clearly implicates the policies both of maintaining loyalty to the first client and of protecting that client's confidences. These same principles give rise to the general rule that, where

ForAttorneys/ProfessionalStandardsforAttorneys/Professional_Standar.htm [accessed May 6, 2010].)

**6.** The Appellate Divisions of the Supreme Court adopted as joint rules the Disciplinary Rules of the Code of Professional Responsibility, effective September 1, 1990, which were promulgated under 22 NYCRR former part 1200.

an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation (*id.* at 295; *see also,* Code of Professional Responsibility DR 5-105 [D] [22 NYCRR 1200.24 (d)]; DR 5-108 [22 NYCRR 1200.27 (a) (1)])" (*Kassis* at 616).

The associate in *Kassis* was not a public official who had left government employ. Instead he had moved from one private firm to another. At the time *Kassis* was decided, under the prior Code of Professional Responsibility (and the ABA Model Rules), there was no provision allowing for screening to avoid disqualification when an attorney moved from one private firm to another.[7] DR 5-105 (d) banned continued employment by any attorney in the firm in connection with a matter once the side-switching attorney joined the firm. However, notwithstanding the Code, the Court in *Solow v Grace & Co.* (83 NY2d 303 [1994]), in denying disqualification, rejected a per se rule of disqualification based on imputed confidences, reasoning that this rule is "unnecessarily preclusive because it disqualifies all members of a law firm indiscriminately, whether or not they share knowledge of [a] former client's confidences and secrets." (83 NY2d at 309.)

In light of *Solow,* the Association of the Bar of the City of New York, in an amicus brief filed in *Kassis,* urged screening as a way to avoid disqualification. The Association wrote, "In resolving this case, this Court has the opportunity to articulate a clear standard for determining when screening is a workable alternative to disqualification of an entire firm. Such a standard would comport with past decisions of this Court favoring a client's right to counsel of choice." (1999 WL 33660287, *7 [1999].)

The Court agreed, in part, declaring,

---

**7.** Screening in the context of lateral movement between private firms has been the subject of exhaustive debate. As of September 2009 approximately two dozen states permitted screening, despite the fact that the ABA had discussed, but resisted, incorporating the procedure in its Model Rules. (Gillers, Simon and Perlman, Regulation of Lawyers: Statutes and Standards, at 149 [Aspen Publs, concise ed 2010].) Eventually ABA Model Rules rule 1.10 was amended, by a narrow vote, to permit screening in 2009. (ABA Model Rules of Professional Conduct rule 1.10 [a] [2].) However, the current New York rules do not permit screening as a way of avoiding disqualification when a lateral move is made between two private firms and when the newly hired attorney has acquired confidential information at the first firm. (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.10 [c].)

"Moreover, while the disciplinary rules governing lawyers prohibit attorneys who have represented the former client in a matter from switching sides and impute one attorney's personal conflicts of interest to his or her current firm (DR 5-105 [D] [22 NYCRR 1200.24 (d)]; DR 5-108 [22 NYCRR 1200.27 (a) (1)]), they do not establish a mandatory disqualification rule. Indeed, as we stated in *S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp.* (69 NY2d 437), because disqualification of a law firm during litigation may have significant adverse consequences to the client and others, it is particularly important that the Code of Professional Responsibility not be mechanically applied when disqualification is raised in litigation (*id.,* at 444)." (93 NY2d at 617 [internal quotation marks omitted].)

Nonetheless, while rejecting a per se rule of law firm disqualification, the Court declared that there was a presumption of shared confidences and that the movant had to carry the "heavy burden" of proof "that any information acquired by the disqualified lawyer is unlikely to be significant or material in the litigation" (*Kassis*, 93 NY2d at 617-618). If, and only if, that burden was met, could the firm continue and,

"[b]ecause even the appearance of impropriety must be eliminated, it follows that even where it is demonstrated that the disqualified attorney possesses no material confidential information, a firm must nonetheless erect adequate screening measures to separate the disqualified lawyer and eliminate any involvement by that lawyer in the representation." (*Kassis* at 618.)

It is for this reason petitioners contend screening will not suffice. First, they argue, Casey has not met the "heavy burden" of demonstrating that he is not in possession of significant and material confidential information and, therefore, screening is not available under *Kassis*. Second, petitioners claim an appearance of impropriety under the facts of this case precludes approval of the screening process. Lastly, petitioners argue that the alleged screening which occurred was not timely and effective as required.

B. Does *Kassis* Prohibit Screening under Rule 1.11?

At the time *Kassis* was argued, while the Code of Professional Responsibility did not allow for screening in the case of private attorneys (DR 5-105 [22 NYCRR 1200.24]), it specifically autho-

rized screening for public officers and employees even when they had participated personally and substantially in the same matter or held confidential government information about the matter (DR 9-101 [B] [22 NYCRR 1200.45]). The Court of Appeals did not directly address the exception for government officials in *Kassis* since it was not an issue before the Court.

The efficacy of screening in the limited context of a former prosecutor has been acknowledged and endorsed in ethics opinions for years, both before (*see e.g.* NY St Bar Assn Comm on Prof Ethics Op 502 [1979] [condoning continued representation of a criminal defendant by firm which screened an assistant district attorney, who had been aware of the prosecution, from participation]; NY St Bar Assn Comm on Prof Ethics Op 634 [1992] [finding that although former government attorney may not in private practice represent another governmental body in matters in which the attorney participated, lawyers in same firm may do so if in compliance with conditions of DR 9-101 (B)]), and after (NY St Bar Assn Comm on Prof Ethics Op 748 [2001], 2001 WL 1516692), *Kassis* was decided and has not been challenged successfully.

The Code before 2009 and the current Rules explicitly distinguish treatment of government attorneys and private attorneys. The distinction is not without sound reason:

> "The Rules of Professional Conduct are grounded on this basic premise. Governments need and want good young lawyers to devote some time to public service without depriving themselves of the ability to obtain employment thereafter. Recognizing this public purpose, the Rules allow government counsel to do what a lawyer moving from one firm to another cannot do without a client waiver: that is, move from one side to the other, with only notice to the government and parties." (*Barnes ex rel. Estate of Barnes v District of Columbia*, 266 F Supp 2d 138, 141 [D DC 2003].)

The Appellate Division, Second Department, recently explained the disparity in that rule 1.11 (a) (2) "represents a balancing of interests" (*Matter of Coleman*, 69 AD3d 846, 849 [2d Dept 2010], citing ABA Model Rules of Prof Conduct rule 1.11, Comment 4 [2006]). Comment 4 states, in pertinent part:

> "The rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to

and from the government. The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards . . . The provisions for screening and waiver in paragraph (b) are necessary to prevent the disqualification rule from imposing too severe a deterrent to entering public service." (New York State Bar Association, Rules of Professional Conduct rule 1.11, Comment 4.)

Aside from the practical exigencies described in *Barnes*, *Coleman* and Comment 4, as a matter of principle there is a distinction to be recognized between the case where an attorney switches sides in private litigation and the situation here, protected by rule 1.11, where the former employer is not a party to the litigation. The government, unlike the situation in *Kassis*, does not have the prospect of facing a former counsel or his firm in litigation. As long as confidential government information is protected from disclosure, the nonparty government agency can stand by unconcerned with the outcome of the litigation. Rule 1.11 provides for written notice to the appropriate government agency to enable it to ascertain compliance with the Rules. (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.11 [b] [1] [iv].) In particular, rule 1.9 prohibits use or disclosure of confidential information and, with adequate and timely notice, the client (the government agency) is in the best position to guard against misuse of its own secrets.

In sum, because: (1) long-standing and unchallenged court rules, endorsed for years by State and City Bar Associations, have authorized screening of government officers to prevent disqualification of an entire firm; (2) the rule permitting screening was recently repromulgated (with minor reformulation, compare rule 1.11 with its predecessor DR 9-101 [b]) notwithstanding the holding in *Kassis*; (3) the Appellate Division, with the four departments acting jointly, consciously elected not to enact similar screening provisions in nongovernmental situations, unlike the ABA Model Rules (*compare* ABA Model Rules of Professional Conduct rule 1.10, *with* Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.10), thereby signaling a specific intention to separate governmental transfers from private transfers; and (4) the case now before the court does not involve direct switching of sides as in *Kassis*, it is the opinion of the court that the holding in *Kassis* does not deprive respondents of the ability to avail themselves of a properly conducted screening procedure.

## C. Appearance of Impropriety

In *Kassis* the Court declared that "even the appearance of impropriety must be eliminated" (*Kassis*, 93 NY2d at 618). This, in part, was a reiteration of Canon 9 of the repealed Code which provided that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." The current rule 1.11, as adopted in New York, specifically adds, after authorizing screening for government officers, there must be "no other circumstances in the particular representation that create an appearance of impropriety" (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.11 [b] [2]). Notably, the ABA Model Rules do not use the term anywhere within the rules. The addition of this language in the New York Rules, aside from being a carryover from the predecessor DR 9-101 (b), is an apparent nod to the caution in *Kassis* against appearances of impropriety and thereby acts as an additional restraint upon screening, which as explained above, does not generally enjoy wide acceptance in New York.

For that reason, petitioners also argue that respondents must be disqualified because the circumstances surrounding Casey's employment by K & K lend themselves to an appearance of impropriety, which standing alone requires disqualification. Respondents dispute the logic of this argument, but in any event deny any such impropriety.

Outside the context of rule 1.11, there is a general recognition that "appearance of impropriety," without more, is too vague a standard to justify disciplinary measures or disqualification. So, for example, the Appellate Division, Second Department, recently held, "Absent actual prejudice or a substantial risk thereof, the appearance of impropriety alone is not sufficient to require disqualification of an attorney." (*Matter of Lovitch v Lovitch*, 64 AD3d 710, 711 [2d Dept 2009] [citations omitted]; *see also Christensen v Christensen*, 55 AD3d 1453, 1455 [3d Dept 2008] ["If an attorney's representation of a client 'does not violate (an) ethical or disciplinary rule, there can be no appearance of impropriety' "]; *Develop Don't Destroy Brooklyn v Empire State Dev. Corp.*, 31 AD3d 144, 153 [1st Dept 2006], *lv denied* 8 NY3d 802 [2007].) In any event, the mere appearance of impropriety alone would be insufficient to warrant disqualification. Rather, it must be shown that a party will suffer actual prejudice or a substantial risk thereof (*see id.*; *Matter of Stephanie X.*, 6 AD3d 778, 780 [3d Dept 2004]).

However, given New York's cautious approach to the acceptance of screening and in light of the specific directive in rule

1.11 (b) (2), the court permitted evidence on the question of the appearance of impropriety at the hearing.

The essence of petitioners' claim is: (1) the belief, which K & K disputes, that the investigation of the ARS sales to Essex Equities Holdings (Essex) by Lehman was referred to the U.S. Attorney by K & K (respondents contend that it is unclear who initiated the contact and investigation, but don't deny that there was contact between the office and K & K);[8] (2) Casey led the investigation and, perhaps, personally had conversations with K & K counsel;[9] (3) K & K advertises on its Web site that it employs a number of former federal prosecutors and writes that, where appropriate and legitimate, the firm looks to "leverage the significant collateral benefits to our civil suit that can result from a parallel government investigation." (Http:// www.kobrekin.com/practice_areas/institutional-plaintiffs-litigation.html); and (4) the arbitration had been "on hold" for almost a year until just six days after Casey joined the firm, at which time K & K expressed an interest in going forward.

In sum, petitioners argue, "A law firm should not be permitted to actively assist a Deputy Bureau Chief in the United States Attorney's Office in conducting a criminal investigation of the same individual the law firm's clients are suing, hire him as a partner and continue the representation." (Petitioners' reply mem of law in further support of their petition for an order disqualifying respondents' law firms and staying arbitration ¶ 21.)

Respondents counter that the claims, in all, are speculative and, in particular: (1) Mr. Kim testified that to the best of the information he was able to gather from recollections of the firm's attorneys, it was the U.S. Attorney's Office that initiated the contact, not K & K; (2) Casey did not leave the agency to work for K & K, but in fact worked for four months at another firm before becoming a partner at K & K; and (3) the reactivation of the arbitration was a matter of coincidental timing, since it was not until their investigation revealed insurance coverage in the summer of 2009 that the case became economically viable, with respondents approving reactivation in September

**8.** Mr. Kim testified that his firm did initiate contact with the New York State Attorney General and the SEC. (Transcript at 83, 86.)

**9.** While not testifying to direct conversations, Mr. Kim, having spoken to a partner about contacts between the firm and the U.S. Attorney's Office, said "there is an inference [Casey] was involved." (Transcript at 100.)

2009 before Casey joined the firm.[10] In sum, they argue that the underlying facts claimed to support a finding of impropriety are speculative, conclusory and unfounded. (Respondents' post-hearing mem of law in further opposition to petition for order disqualifying respondents' law firm and staying arbitration ¶¶ 28-31.)

The core factual allegations leading to the charge of impropriety are in dispute and, given the necessary secrecy that surrounds the internal workings of the U.S. Attorney's Office during the course of a criminal investigation, difficult to assess. When facts are in question, the Court of Appeals reminds us,

> "[D]isqualification motions present competing concerns. Balanced against the vital interest in avoiding even the appearance of impropriety is concern for a party's right to representation by counsel of choice and danger that such motions can become tactical 'derailment' weapons for strategic advantage in litigation (*S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp.*, 69 NY2d 437, 443). With these considerations in mind, it is clear that a movant must offer more to justify disqualification. Allowing a party seeking disqualification to meet its burden by generalized assertions of 'access to confidences and secrets' would both make it difficult, if not impossible, to test those assertions and encourage the strategic use of such motions." (*Jamaica Pub. Serv. Co. v AIU Ins. Co.*, 92 NY2d 631, 638 [1998].)

Accordingly, "A party's entitlement to be represented in ongoing litigation by counsel of its own choosing is a valued right which should not be abridged absent a clear showing that disqualification is warranted." (*Dominguez v Community Health Plan of Suffolk*, 284 AD2d 294, 294-295 [2d Dept 2001] [reversing a court's determination to disqualify based on "conclusory assertions and speculation"].) Motions to disqualify must be "carefully scrutinized" (*S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp.*, 69 NY2d 437, 443 [1987], citing *Matter of Abrams [John Anonymous]*, 62 NY2d 183, 196 [1984]).

Separating speculation from demonstrated fact, the most that can be said here is that Casey personally participated to a substantial and material degree in the same matter, that he

---

**10.** Although it is worth noting that Casey was working for another firm, Mayer Brown, when K & K offered Casey employment as a partner in September, around the time respondents decided to reactivate the arbitration.

acquired confidential government information, that he had some level of contact with K & K in connection with the case, and that four months after leaving the agency, he joined the firm as a partner. Although there is some foundation to petitioners' suspicions, without more, the court is unwilling to make the finding, on the claims here, that an appearance of impropriety standing alone prevents the remaining lawyers in the firm, if properly screened, from continuing to represent respondents.

At the same time, the court shares the thought contained within Comment 6 to rule 1.11,

> "There may be circumstances where representation by the personally disqualified lawyer's firm may undermine the public's confidence in the integrity of the legal system. Such a circumstance may arise, for example, where the personally disqualified lawyer occupied a highly visible government position prior to entering private practice, or where the facts and circumstances of the representation itself create a risk that the representation will appear to be improper. Where the particular circumstances create such a risk, a law firm may find it prudent to decline the representation, but Rule 1.11 does not require it to do so."

## D. The Size of the Firm

Petitioners argue that screening is never available to a small firm. They characterize K & K as a small law firm. (There is some dispute about the precise size of K & K since it is a moving target, but it appears that the firm has anywhere from 33 to 40 attorneys placed in four different locations with about 20 of the lawyers working in the New York office on the same floor with Casey. It has 100 employees in all.) Petitioners argue that the presumption of shared or inadvertently disclosed confidential information cannot be overcome in a law firm where a small number of attorneys necessarily encounter each other and interact. They cite, for example, *Kassis* where the associate left a 26-member law firm and the Court stated,

> "To determine whether the presumption of shared confidences and disqualification has been rebutted, consideration must be given to the particular facts of each case. Where, for example, a disqualified attorney formerly worked in a small law firm characterized by a certain informality and conducive to ' "constant cross-pollination" ' and a ' "cross current of discussion and ideas" among all attorneys

on all matters which the firm handled,' there will be a greater likelihood of acquiring material client confidences." (*Kassis*, 93 NY2d at 617-618 [citations omitted].)

Petitioners point to numerous cases where firms were disqualified and firm size was a considered factor. (*Cheng v GAF Corp.*, 631 F2d 1052 [2d Cir 1980] [35 lawyers]; *Decora Inc. v DW Wallcovering, Inc.*, 899 F Supp 132 [1995] [44 lawyers]; *Yaretsky v Blum*, 525 F Supp 24 [SD NY 1981] [30 lawyers]; *Marshall v State of N.Y. Div. of State Police*, 952 F Supp 103 [ND NY 1997] [15 lawyers]; *United States v Uzzi*, 549 F Supp 979 [SD NY 1982] [11 lawyers].) In particular, they cite *Crudele v New York City Police Dept.* (2001 WL 1033539, 2001 US Dist LEXIS 13779 [SD NY 2001]) for the proposition that screening is "inadequate in the context of a small law firm" (2001 WL 1033539, *3, 2001 US Dist LEXIS 13779, *11). From this, and the cases cited within *Crudele*, petitioners argue that screening is "inherently ineffective in small firms" (letter brief, Barry S. Gold, May 21, 2010, ¶ 3).

However, none of the cases cited by petitioners, or the court in *Crudele*, stands for a per se rule against screening. In each of the cases, size was a contributing factor in the decision to disqualify, but there were aggravating factors[11] which, as in *Crudele*, raised "grave concerns about both the possibility of unintentional breaches of client confidences and about the appearance of impropriety" (2001 WL 1033539, *4, 2001 US Dist LEXIS 13779, *14). In fact, the Second Circuit, referring to the ruling in *Cheng* (*supra*), where a 20-person firm was disqualified, explicitly stated that a per se rule was not intended by that ruling, "We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from *de facto* separation that effectively protects against any sharing of confidential information—cannot adequately protect against

11. *Cheng v GAF Corp.*, 631 F2d 1052 (1980) (transfer between private adversaries and former employer specifically objected); *Decora Inc. v DW Wallcovering, Inc.*, 899 F Supp 132 (1995) (screening not timely and attorney continued to work in same department with attorneys involved in continued representation); *Yaretsky v Blum*, 525 F Supp 24 (1981) (attorney continued to work with small group of attorneys at new firm with whom he interacted on a daily basis); *Marshall v State of N.Y. Div. of State Police*, 952 F Supp 103 (1997) (untimely screening); *United States v Uzzi*, 549 F Supp 979 (1982) (strong objection by government in the face of evidence that attorney had been exposed to potentially sensitive criminal investigative matters including eavesdropping and pen register materials).

taint." (*Hempstead Video, Inc. v Incorporated Vil. of Val. Stream*, 409 F3d 127, 138 [2d Cir 2005].)

A per se rule against screening for small firms has not been the law heretofore in New York and would be impractical to adopt. Where would the line be drawn? Would it be inflexible? The better course, and the one the court chooses to follow, is the one outlined in Comment 7 to rule 1.11 which permits screening but cautions: "A small firm may need to exercise special care and vigilance to maintain effective screening but, if appropriate precautions are taken, small firms can satisfy the requirements of [rule 1.11]." (New York State Bar Association, Rules of Professional Conduct rule 1.11, Comment 7.)

E. Whether Respondents Satisfied Rule 1.11

The final question for the court is whether K & K did in fact "exercise special care and vigilance to maintain effective screening" (rule 1.11, Comment 7). Petitioners claim that Casey was not "timely and effectively screened" (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.11 [c]) and the firm did not act "promptly and reasonably . . . to . . . notify . . . lawyers . . . within the firm . . . [to] implement effective screening procedures . . . and [to] give written notice" to the U.S. Attorney's Office, all of which is required by rule 1.11 (b) (1) (i) and (ii).

The ABA Model Rules do not use the term "effective" in describing screening. New York inserts the word in its version of rule 1.11, once again demonstrating New York's cautious, if not reluctant, approval of screening to avoid imputation. Petitioners contend that K & K failed to "timely and effectively" screen Casey in at least three regards: (1) notice of Casey's "isolation" was belated, unwritten and indirect; (2) notice to the agency was belated and unwritten; and (3) Casey interacted with members of the Essex team on other matters, thereby inviting inadvertent disclosures.

1. Rule 1.11 (b) (1) (i): Notifying Those Within The Firm; Untimely and Unwritten

Rule 1.11 (b) (1) (i) requires the firm to "notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client." This notification must be given "promptly and reasonably." By definition, "screening" requires "timely imposition of procedures within a firm" (rule 1.0 [t]).

Kim knew, "prior to the hiring of Casey," that the firm needed to implement "certain screening procedures" (transcript at 28). At the time, Ben Leyland, an administrative staff member in charge of implementing "the various processes that relate generally to client satisfaction, risk management, [and] product development . . . wanted to send around memoranda about the screening issues" (*id.* at 103). Kim found it "superfluous" because "it was not really even appropriate to be talking" to the rest of the firm "about not talking to Sean Casey about the Essex matter since these people actually had nothing to do with the Essex matter to start with" (*id.* at 109).

K & K had "silos or compartments of lawyers and teams" (*id.* at 140), i.e., "there are clearly defined case teams, so there is a specific list of people for each case that are staffed" on that case (*id.* at 26-27). "[W]ho to staff on the case, who to take off or who to add is one that is controlled centrally by both the partner on the case, the partner in charge of the case, as well as the managing partners," Steven Kobre or Kim, "such that for any particular client matter" only the team assigned to that case may "work on that client matter" (transcript at 27). If attorneys within a team "wish to involve other lawyers in the firm," they must obtain "the permission of the partner in charge of that team, as well as" Kobre or Kim, to have "anybody else to work on that particular matter" (*id.*). "In connection with the Essex case," Robert Henoch was the partner at K & K where "in order for someone on the Essex team to have spoken to someone off the team," that individual would have required the permission of Henoch and Kobre or Kim (*id.* at 32).

Before Casey started work at K & K, Zoe Ehrlich, K & K's "Chief Administrative Officer, who is also a lawyer . . . [and] performs a managerial administrative function," met with Casey "to make sure she would be able to identify any matters" from which Casey would have to be screened (*id.* at 29-30, 35). Further, both Kobre and Kim met with Casey on "separate occasions within the first several days of his starting at the firm, and had a formal conversation with him about the importance of not being involved in any cases" within K & K that would have any "overlap with anything he handled" beforehand (*id.* at 31).

On December 9, 2009, a memorandum was issued firm-wide (respondents' exhibit 1), which listed screened-off matters by their identification number "code" (which is how matters are referenced within K & K) (transcript at 432, 141). The memo-

randum's recitation of screened matters by code referred to all matters being handled in K & K which were investigated or prosecuted by the United States Attorney's Office for the Eastern District of New York, Casey's former employer. The memorandum instructed personnel "not to discuss in front of or consult with Sean Casey regarding any aspect of the above-referenced client matters" (listing 34 files by reference number, not name) (Mem dated Dec. 9, 2009, respondents' exhibit 2).

Although Kim described various methods by which the firm isolates or segregates work assignments, the December 9 memorandum is the first firm-wide written notification regarding Casey. Since this came two months after Casey began work in the small firm, petitioners complain that the likelihood of inadvertent sharing of information is significant.[12]

In *Chinese Auto. Distribs. of Am. LLC v Bricklin* (2009 WL 47337, 2009 US Dist LEXIS 2647 [SD NY 2009]), a firm waited three months before establishing an "ethical wall." The court found,

> "The delay was too long. 'To prevent one lawyer's conflicts from being imputed to his firm, the firm must immediately, and effectively, screen that lawyer from any contact with any relevant cases, such that there can be . . . "no doubts as to the sufficiency of these preventive measures." ' *Panebianco v. First Unum Life Ins. Co.*, No. 04 Civ. 9331(JSR), 2005 WL 975835, at *3 (S.D.N.Y. Apr.27, 2005). The 'screening measures must have been established from the first moment the conflicted attorney transferred to the firm or, at a minimum, when the firm received actual notice of the conflict.' *Mitchell v. Metropolitan Life Ins. Co., Inc.*, No. 01 Civ. 2112(WHP), 2002 WL 441194, at *9 (S.D.N.Y. Mar.21, 2002); *accord Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1087 (S.D.N.Y. 1989) ('This Court doubts whether any Chinese walls, which are meant to be preemptive, can ever function effectively when erected in response to a motion, and not prior to the arising of the conflict.'); *Marshall v. State of New York Div. of State Police*, 952 F.Supp. 103, 111 (N.D.N.Y. 1997) ('. . . a screen-

---

**12.** Casey testified that he knew not to discuss the matter with anyone in the firm and that he never did (transcript at 138). The court is willing to credit this statement while recognizing the distinction between conscious and inadvertent disclosures.

ing device implemented only after a disqualified lawyer has been with a firm will not provide adequate protection of confidences.'); *Restatement (Third) of the Law Governing Lawyers* § 124 cmt. d(i) (2000) ('The required screening measures must be imposed in the subsequent representation at the time the conflict is discovered or reasonably should have been discovered . . . .').'' (2009 WL 47337, *4, 2009 US Dist LEXIS 2647, *12-13.)

Along the same lines, Comment 10 to rule 1.0 (t) (defining "screening") provides, "In order to be effective, screening measures must be implemented as soon as practicable after a lawyer or law firm knows or reasonably should know that there is a need for screening."

K & K contends that lawyers[13] in the firm were effectively notified at an earlier state since their usual practice of creating silos of isolation, "compartmentalized" (respondents' post-hearing mem of law ¶ 8) the attorneys and that Casey was personally advised at an early stage of his employment that he was not to discuss any of the matters upon which he had worked. They argue that the procedures and the advice to Casey are the functional equivalent of prompt and reasonable notice to all personnel. It is not. Simply advising Casey not to discuss any of the 34 or so matters which were actively under investigation in the U.S. Attorney's Office involving K & K is not an effective screening measure. Simply telling the other attorneys, as a general rule of office procedure, not to participate in discussions about their cases outside of their "silo" does not approach meaningful compliance with the directive in rule 1.11 (b) (1) (i) that the firm notify attorneys and nonlawyers working on the Essex matter that when the case was discussed Casey was not to be present.

K & K points out, correctly, that there is no explicit requirement that the notification to other personnel need be in writing. The rule only calls for prompt notification "as appropriate" (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.11 [b] [1] [i]). Although the Rules do not require written notice in

---

**13.** The rule also requires "appropriate" notice to nonlawyers. There are more than 60 nonlawyers in the firm and at least 3 or 4 work on the Essex case. It is unclear if any of them received notice prior to December. "If the disqualified lawyer works in a small firm . . . then the notice probably should go to everyone who works in the office, lawyers and non-lawyers alike." (Simon, New York Rules of Professional Conduct Annotated, Commentary on rule 1.11 (b), at 145 [2009 ed].)

every case, given the size of the firm and the interaction with attorneys working on the matter, a rule of reason would demand, at the very least, clear and unequivocal direction to other attorneys in the firm. (*See e.g.* rule 1.0, Comment 9 ["(O)ther lawyers in the firm who are working on the matter should promptly be informed that the screening is in place and that they may not communicate with the personally disqualified lawyer with respect to the matter"].) A writing would have memorialized the terms, timing, scope and form of the notification and given an indication of which personnel received the notification, as well as offering proof that the other lawyers actually had received the notification, all of which would have helped to overcome the claim of impropriety.

In sum, the notice here was vague, untimely and ineffective.

2. Rule 1.11 (b) (1) (iv): Written Notice to Appropriate Government Agency

In order to ensure that confidences are not disclosed or exploited, the rule requires the firm to "promptly and reasonably . . . give written notice" to the agency (rule 1.11 [b] [1] [iv]). Remembering that screening is intended to apply only in cases where the agency does not consent to the attorney's participation (which is the case here), the purpose of the notice is to enable the agency to ascertain if the firm itself complies with the Rules protecting its confidences.

On January 27, 2010 K & K sent "formal written notice" (letter, Robert Henoch to Peter Norling, dated Jan. 27, 2010, ¶ 1 [respondents' exhibit 4]). This is almost four months after Casey began work at K & K and eight months after he left the office to go into private practice. K & K does not argue that this met the standard of "prompt" notification.

Nevertheless, Casey testified that "beginning in July of '09," when he began seriously considering joining K & K, "up through July, August, and September," he "had at least four conversations with people—representatives of The United States Attorney's Office" (transcript at 130-131). He spoke with Benton Campbell, the U.S. Attorney, Paul Schuman, who is the Chief Assistant United States Attorney, Peter Norling, the professional responsibility officer at the U.S. Attorney's Office, and "Jay or James McMahon, who is the chief of the business and securities fraud unit" (*id.* at 129, 131). In these conversations, they discussed "what [Casey] could and what [Casey] could not handle" (*id.* at 130-132).

K & K argues that the oral, unrecorded, conversations suffice to meet the rule. The argument is flawed in two regards.

There is a significant difference between a discussion about Casey's need to personally disqualify himself as against the firm's need to enact procedures against inadvertent disclosures. Merely telling personnel within the office that he was going to work for K & K, and that he would avoid conflicts, does not give the agency sufficient information to ascertain whether the firm is taking measures to protect against inadvertent disclosure or use of confidences. The notice called for by rule 1.11 should include "a description of the screened lawyer's prior representation and of the screening procedures employed" (New York State Bar Association, Rules of Professional Conduct rule 1.11, Comment 7B). The discussions Casey describes occurred before he joined K & K, while he worked at Mayer Brown, in July, August and September. It cannot be said that he gave a description of the screening procedures employed at K & K to the U.S. Attorney's Office or gave sufficient notice of the matters involved for the agency to ensure compliance with the Rules before Casey even began working at K & K.

As well, the Rules generally are sparing and selective in requiring "written" notice. Frequently, the Rules dispense with the necessity of a writing. A writing is necessary only in a few cases, e.g., matters involving: (1) fees and retainer agreements (*see generally* Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.5); (2) consent to conflicts or potential conflicts (*see generally* rules 1.7, 1.9, 1.10, 1.11, 1.12); (3) sale of practice (rule 1.17); or (4) advertising that affects a client (rule 7.1). The New York rule requiring a writing makes sense in the context of notice to an agency in order to avoid the very situation which occurred here, oral conversations between coworkers which, many months later, are recalled but unrecorded and undocumented. Strict adherence to the writing requirement would seem to be the only plausible way to dispel concerns that "the lawyer's subsequent private client [has obtained] an unfair advantage because the lawyer has confidential government information about the client's adversary" (rule 1.11, Comment 4A). The requirement of written notice to the agency is not one which can readily be overlooked.

3. Interaction with Other Lawyers

Rule 1.0 (t) defines screening as including "isolation" from participation in the related matter. K & K has approximately 20 lawyers working on one floor of an office building in New York.

In the seven or so months that Casey has been at the firm, he acknowledges that he has worked on other matters where he has had some contact with Kim, Henoch and possibly others on the Essex team. Casey admits that he and Henoch, the partner at the head of the Essex team, are good friends. Under that circumstance, rule 1.11, Comment 7 warns, "If a personally disqualified lawyer is working on other matters with lawyers who are participating in a matter requiring screening, it may be impossible to maintain effective screening procedures."

Given the size of the firm and the apparent complexity of the Essex matter, anything less than complete isolation understandably contributes to petitioners' skepticism about the effectiveness of the screening procedures in place. As the court observed in *Crudele*, "[T]he degree of both past and present interaction between [the screened lawyer and others working on the matter] raises grave concerns about both the possibility of unintentional breaches of client confidences and about the appearance of impropriety . . ." (2001 WL 1033539, *4, 2001 US Dist LEXIS 13779, *14; *see also Baird v Hilton Hotel Corp.*, 771 F Supp 24, 27 [ED NY 1991] [finding that with "daily contacts with . . . counsel there remains a danger of inadvertent disclosure . . . (and an) obvious appearance of impropriety"]).

## III. Conclusion

K & K failed to comply with the screening requirements of rule 1.11 to a material degree. Given a combination of factors here: a small firm, a large, publicly noticed and complex matter necessarily involving a team of attorneys within the firm, vague and questionable timing of notice to members of the firm, belated notice to the agency, interaction rather than isolation between the conflicted attorney and others involved in the matter, an overall founded suspicion of unfair advantage, the court must reluctantly conclude that K & K's continued involvement would leave a question mark hanging over the validity and integrity of the ensuing arbitration. Petitioners ask the court to reject what they characterize as respondents' "absolutist" approach to the rules (petitioners' post-hearing mem of law ¶ 22). They ask that the court forgive or overlook shortcomings in the implementation or timing of the procedures employed and to apply a practical or "common-sense" test (*id.* ¶ 20). The court agrees that an absolutist or hypertechnical approach would be unfair to their client. However, condoning anything less than vigilance and careful adherence to the Rules would be unfair to

respondents and Casey's former client and would invite future applications for "practical" rather than thoughtful compliance.

For the reasons stated, it is hereby ordered, that petitioners' motion to disqualify K & K is granted; and it is further ordered, that the arbitration proceeding is stayed for a period of 30 days at which time substitute counsel may appear and be heard as to any further applications for a continued stay; and it is further ordered, that the Clerk will calendar petitioners' application to disqualify the Law Offices of Jay Y. Mandel, PLLC, within 30 days.